# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### TEXARKANA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **V.** | § | **5:07-CR-4** |
| | § | |
| **ROBERTO GONZALEZ** | § | |

## REPORT AND RECOMMENDATION OF
## THE UNITED STATES MAGISTRATE JUDGE

**CAME ON TO BE CONSIDERED THIS DAY** Defendant's Motion to Suppress Evidence (Docket Entry # 13). The Court, after reviewing the motion, the response, and hearing arguments of counsel, recommends the motion be **DENIED**.

## I. BACKGROUND

Roberto Gonzalez ("Defendant") is charged with intent to evade a currency reporting requirement under Title 31, United States Code, Section 5316, by concealing more than ten thousand dollars in United States currency[1] in a vehicle and attempting to transfer the currency from Texas to Mexico, in violation of Title 31, United States Code, Section 5332. The violation is alleged to have occurred April 6, 2006, in Titus County, Texas. Defendant filed a motion to suppress the evidence seized in a traffic stop. The Court conducted a hearing on Defendant's motion on June 27, 2007.

## II. DEFENDANT'S MOTION TO SUPPRESS

Defendant contends Hogue did not have reasonable suspicion, probable cause, or other authority to initiate the traffic stop. Defendant further asserts, upon conclusion of the initial alleged purpose of the traffic stop, Hogue unlawfully continued to detain Defendant without authority. Finally, Defendant argues his alleged consent to search was involuntary based on the circumstances

---

[1] Specifically, the amount was $100,000-$150,000.

surrounding his detention.  Defendant argues the evidence seized as a result of this search should be suppressed.

The Government asserts there was reasonable suspicion to initiate the traffic stop.  The Government further asserts several circumstances during the stop entitled the officer to detain Defendant until he had satisfied his suspicions.  Finally, the Government contends Defendant's consent was freely and voluntarily given.

### III.  TESTIMONY AT THE HEARING

The Government introduced as evidence a videotape of the stop.  After the tape was played, DPS Trooper Joseph Hogue ("Hogue") testified regarding his detention of Defendant on April 6, 2006.  Hogue has been with the Department of Public Safety since February of 1996 (Tr. 11).  He worked three years with a narcotics division in the San Antonio area (Tr. 11).  During the course of his work, he has become aware of methods drug traffickers use (Tr. 11).

Hogue further testified as follows.  On April 6, 2006, at approximately 6:06 p.m., Hogue was patrolling the westbound lanes of Interstate Highway 30 in Titus County, Texas (Tr. 19). On the date in question, Hogue was traveling west from Mt. Pleasant when he observed a group of cars coming up behind him (Tr. 12).  As the cars approached the trooper's vehicle, Hogue veered to the right improved shoulder (Tr. 12).  Hogue then noticed a red vehicle attempt to change from the right lane into the left lane.  While attempting to change lanes, another car was in the left lane and had to swerve to avoid contact with the red car (Tr. 12-14).  The red car realized another car was in the left lane and quickly returned to the original lane.  Hogue observed the red car's swerving back into the right lane (Tr. 12-14).

Hogue stopped the red car for failure to maintain a lane which Hogue testified is conduct in

2

violation of the Texas Transportation Code (Tr. 12-13). In Hogue's opinion, the evasive action was a danger to the car attempting the lane change or the other car.[2]  (Tr. 29).  Defendant was identified as the driver of the red car (Tr. 15).

During the course of the stop, Hogue asked Defendant for his insurance and driver's license (Tr. 15-16).  When Defendant retrieved his insurance from the glove box, Hogue noticed a Super 8 Motel notepad with information (cities and numbers) on it (Tr. 16). Defendant immediately covered the notepad with another piece of paper that had fallen out of the glove box onto the floorboard (Tr. 16).  It was obvious to Hogue that Defendant covered the notepad intentionally so that Hogue could not see what was written on it (Tr. 16).  Suspicious, Hogue then asked Defendant what the notepad was (Tr. 16).

Defendant acted nervous and first responded that he did not know what it was (Tr. 17). Defendant then explained he had written cities and where he had gotten gas on the notepad. Defendant also stated his wife aunt's name and phone number may also be written on the notepad (Tr. 17).  Hogue testified Defendant seemed nervous and hesitant in discussing the notepad (Tr. 17). When Hogue first asked Defendant about the notepad, he could not explain it; he stuttered a lot and had to think of something to say (Tr. 18).   From Hogue's experience, when he has found contraband and currency, he has oftentimes also found  names, cities, and numbers relating to gas in gas tanks (Tr. 18-19).[3]

---

[2] Defendant cross examined Hogue about a law in Texas requiring a vehicle to move over into an inside lane when an emergency vehicle is stopped in the improved shoulder.  Hogue's emergency lights were not on at this time (Tr. 29-30).

[3] Hogue testified the gas gauge is affected if the inside of the gas tank is altered. Therefore, oftentimes, drug traffickers will write down how many miles they drive before they have to refuel the car (Tr. 19).

3

After Hogue collected Defendant's driver's license and insurance and discussed the notepad with Defendant, approximately three minutes after the initial stop, Hogue indicated to Defendant he was going to issue a written warning ticket (Tr. 19).  Hogue returned to his patrol car to issue the warning ticket (Tr. 19). Hogue discussed the situation with another trooper who had pulled alongside Hogue's patrol car (Tr. 20).  While the troopers discussed dinner plans, Hogue entered information onto the warning (Tr. 20). Hogue began to discuss some of his suspicions with the other trooper. Specifically, Hogue mentioned the notepad (Tr. 21).

Approximately six minutes after the initial stop, Hogue returned to Defendant's car and provided him the warning (Tr. 21).  Hogue also returned Defendant's driver's license and proof of insurance (Tr. 21).  As Hogue returned Defendant's items to him, Hogue leaned into the open window on the passenger's side of the vehicle.  Hogue continued to lean into the car with his elbows on the open window of the passenger's side of Defendant's car. After returning Defendant's items, Hogue started to "converse" with or question Defendant about his trip (Tr. 22).

Hogue testified that, at that time, Defendant would have been free to go if he had asked (Tr. 21-22).  At that point, Hogue testified that he did not "feel like [he] had enough to detain [Defendant]."  (Tr. 22).  Even though Hogue had suspicions about the notepad, Hogue testified he had not inquired about Defendant's travel so he would have let Defendant go if Defendant had asked to go (Tr. 22).  However, Hogue never made Defendant aware he was free to leave (Tr. 32), and Defendant never expressed a desire to leave (Tr. 22).

After Hogue continued to question Defendant about his trip after returning his items to him, Defendant mentioned his aunt in Harker Heights (Tr. 22).  Defendant explained Harker Heights is located near Killeen, and that he was traveling from Illinois to the Killeen area to visit his aunt (Tr.

4

22-23).  However, when Hogue asked if his aunt knew Defendant was coming, Defendant responded

she did not know he was coming (Tr. 23).  Hogue thought this was suspicious because of the amount

of time Defendant had traveled to visit his aunt without his aunt's knowing to expect him.  Hogue's

suspicions were raised because of this response (Tr. 23).

Hogue then asked Defendant if he had any luggage (Tr. 24).  Defendant responded there were

some clothes in the trunk (Tr. 24).  Defendant asked if Hogue would like to see, and Hogue

responded "if you don't mind."  (Tr. 24).  Hogue had not asked for permission at that point (Tr. 24).

Defendant exited his vehicle and walked to the back of his car (Tr. 25).  Hogue put his clipboard in

his patrol car (Tr. 25).  Defendant unzipped a small bag of clothes in the trunk of his vehicle (Tr. 25).

Hogue inquired a little further about Defendant's aunt (Tr. 25).  Defendant answered she had

cancer, and he wanted to see her (Tr. 25).  Given the small amount of clothing in the trunk and based

on all the circumstances surrounding the stop, Hogue asked Defendant if he had anything illegal in

the car (Tr. 25).  Defendant broke eye contact with Hogue and answered, "no." (Tr. 25).  The break

in eye contact indicated to Hogue that Defendant's stress level had increased (Tr. 25-26).  Hogue

asked Defendant if he could search the car (Tr. 26).  Hogue was given the impression by Defendant

that Defendant did not understand the question (Tr. 26).  There had been no indication of a language

barrier, but out of an abundance of caution, Hogue asked in Spanish if he could search the car.  After

asking in Spanish, Hogue stated "no problemo?"  Defendant repeated, "no problemo." (Tr. 26-27).

Hogue then searched the car (Tr. 27).  Approximately one minute into the search, Hogue

located in the carpet inside the quarter panel of the trunk a "brick shaped object" containing United

States currency, wrapped in clear cellophane (Tr. 27-28).  In Hogue's experience, this is how drugs

are commonly packaged (Tr. 28). Defendant's consent was given approximately nine minutes after

5

the initial stop (Tr. 28).

## IV.  APPLICABLE LAW

### A.    General Rules

The Fourth Amendment protect individuals "against unreasonable searches and seizures." U.S. Const. amend. IV.   "Traffic stops are deemed seizures for the purpose of the Fourth Amendment." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005).  In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court held that police officers may detain individuals briefly on the street, even though there is no probable cause to arrest them, as long as they have a reasonable suspicion that criminal activity is afoot.  Reasonable suspicion under *Terry* must be based on "specific and articulable facts," and the facts must "be judged against an objective standard." *Id*. at 21, 88 S.Ct. at 1880.  In *Michigan v. Long*, 463 U.S. 1032 (1983), the Supreme Court applied the principles of *Terry v. Ohio*, 392 U.S. 1 (1968) to automobile searches.

Pursuant to the Fourth Amendment, the government violates a defendant's constitutional rights by executing a search or seizure without probable cause.  *U.S. v. Kye Soo Lee*, 898 F.2d 1034, 1039 (5th Cir.1990), *cert. denied*, 506 U.S. 1083 (1993).  When a warrantless search or seizure is conducted, the burden shifts to the government to justify the warrantless search.  *U.S. v. Chavis*.  48 F.3d 871, 872 (5th Cir.1995).

The stopping of a vehicle and the detention of its occupants is a seizure within the meaning of the Fourth Amendment.  *U.S. v. Shabazz*, 993 F.2d 431 (5th Cir.1993).  But, where there is a reasonable and articulable suspicion that a person has committed or is about to commit a crime, limited searches and seizures are permissible under the Fourth Amendment despite the lack of probable cause.  *See Kye Soo Lee*, 898 F.2d at 1039 (referring to the reasonable suspicion standard

6

enunciated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).  To determine whether a seizure has exceeded the scope of a permissible *Terry* stop, a court must undertake a two-step inquiry: 1) whether the officer's action was justified at its inception; and 2) whether it was reasonably related in scope to the circumstances that justified the interference in the first place.  *See U.S. v. Kelly*, 981 F.2d 1464, 1467 (5th Cir.1993), *cert. denied*, 508 U.S. 944 (1993).

**B.      Specific Case Law**

**1.      Pre-*Brigham* Cases**

Several traffic stop cases decided before *United States v. Brigham*, 382 F.3d 500 (5th Cir. 2004) are instructive in the resolution of the issue before the Court: *United States v. Dortch,* 199 F.3d 193 (5th Cir.1999), *corrected on denial of rehearing,* 203 F.3d 883 (5th Cir.2000); *United States v. Santiago,* 310 F.3d 336 (5th Cir.2002); and *United States v. Jones,* 234 F.3d 234 (5th Cir.2000).  In *Dortch,* two officers stopped a vehicle at approximately 11:30 p.m. for following too closely to a tractor-trailer on Interstate 10 near Beaumont, Texas. *Dortch*, 199 F.3d at 195. The driver exited the car at the officer's request and produced his license and car rental papers, and he consented to a pat down search for weapons. No weapons were found. *Id.*  The officers examined the rental papers and determined that the car was rented to a third person, and the driver was not listed as an authorized driver. *Id.*  One of the officers then questioned the driver and his passenger about who owned the car and what they were doing in the area. *Id.* at 196. The men gave inconsistent answers about the driver's relationship to the person who had rented the car and their travel plans. *Id.*

While one officer questioned the driver, the other officer performed a computer check for warrants and to determine whether the car was stolen. *Id.*  About eight minutes into the stop and

while the computer check was pending, an officer requested consent to search the vehicle. The driver gave consent to search the trunk, but not the vehicle; no search was performed at that time. *Id.*  The officers told the driver he would be free to leave after the check for warrants was complete but that the officers would detain the car until they had performed a canine search of it. *Id.*  A canine unit was then called. The driver was again patted down for weapons and again nothing was found.  *Id.*

About 14-15 minutes into the stop, the officers received the driver's criminal record from the dispatcher and questioned him about it. *Id.*  The driver was not told that the computer check was complete, although it was, or that the driver would be free to go at any time. *Id.*  Approximately 19-20 minutes after the initial stop, the officers noticed the arrival of the canine unit across the four-lane interstate and median. At that time, the officers informed the driver that the computer check had been completed and turned up nothing, but that the canine unit was going to perform a search nonetheless. *Id.* The driver remained at the scene, and his driver's license and rental papers remained with the officers on the clipboard.  *Id.*

Another ten minutes elapsed during the canine search. The dog alerted on the driver's side door and seat. However, the subsequent search of the car uncovered no contraband. The canine handler then informed another officer that there could be contraband on the body of the person who had been sitting in the driver's seat. *Id.*  The driver then consented to a third pat down search. This time, however, the officer conducted a more thorough search of the driver's person and noticed a large hard bulge in his crotch area. *Id.*  The bulge was a plastic baggie, holding five smaller baggies of cocaine. The driver was later charged with and found guilty of possession with intent to distribute cocaine.  *Id.*

On appeal, the driver did not question the legality of the initial stop, the canine search of the

8

vehicle, or the first two pat down searches. Instead, he argued that at some point the detention became unreasonable and exceeded the scope of intrusion allowed under *Terry* and, therefore the subsequently discovered cocaine was inadmissible as fruit of the poisonous tree. Alternatively, he argued that the third pat down search was itself unreasonable because of a lack of probable cause or consent. *Id.* at 197.

The Fifth Circuit found that, while the detention and questioning of the driver during the running of the computer check was lawful, the Constitution was violated when the detention extended beyond the valid reason for the initial stop. *Id*. at 198. The driver did not feel free to leave even after the computer check was completed because the officers still held his license and rental papers, and they told him they were going to detain the car until the canine unit arrived. *Id.*  The driver's acquiescence to stick around while the dogs completed their search could not be considered voluntary. *Id.*

The Fifth Circuit held there was no reasonable suspicion that the driver was involved in drug trafficking. *Id.* at 199. The answers the driver and the passenger gave, even if suspicious, did not give rise to that inference. Rather, the answers gave rise only to a reasonable inference that the car might have been stolen. *Id.*  When the computer check came back negative, the driver should have been free to leave at that point. *Id.*  Once he was not permitted to drive away, the extended detention became an unreasonable seizure because it was not supported by probable cause.  *Id.* at 199-200.

The officers offered no justification for the 9-10 minute delay in requesting the canine unit. *Id.* at 200. The officer's main duty was drug interdiction, including checking suspected vehicles for narcotics. It was reasonable, therefore, to expect that they would have anticipated needing a canine unit within a few minutes of stopping a suspect. *Id.*  Although the dog's alert on the car established

probable cause to search the interior of the car and to detain the driver until a more thorough search could be completed, by then it was too late: any "probable cause established as a result of the canine search was subsequent to the unlawful seizure." *Id.*

In *United States v. Santiago,* 310 F.3d 336 (5th Cir. 2002), the trooper pulled the defendant over on the belief that the motorist's view was unlawfully obstructed by flashing "trinkets" hanging from the motorist's rearview mirror.  *Id.* at 337-38. The defendant also was traveling fifty miles-per-hour when the speed limit was seventy. After stopping the motorist, the trooper began to suspect that the car was stolen. The driver appeared extremely nervous, and his hands were shaking; the driver was traveling straight through to a distant destination; the driver could not immediately recall his wife's name; the driver's vehicle was registered in another woman's name who was not the defendant's wife; and the driver had an explanation that was inconsistent from that of his passenger as to the parties' ultimate destination. *Id.* at 338-39.

The trooper then ran a computer check of the defendant's license and registration, which eventually came back negative. *Id.* at 339.  Instead of returning the defendant's license and registration, the trooper called for and waited for backup. The officer then explained problems with drugs being smuggled on the interstate highways, and he asked for and obtained consent to search the car. A sealed compartment was discovered in the trunk. *Id.*  The trooper then called for a canine unit which alerted on the car. A subsequent search at the state police headquarters revealed drugs concealed within a false floor.  *Id.*

The Fifth Circuit concluded that the factors upon which the officer relied were insufficient as a basis for reasonable suspicion of drug activity because the officer had not articulated an objective basis to warrant a finding that Santiago had narcotics in his vehicle sufficient to justify the

10

extended detention of him. *Id.* at 342. The trooper's original justification for the stop ended at the time the computer check was completed. At that point, there was no reasonable suspicion that the defendant was trafficking in drugs, but the trooper nonetheless continued his interrogation. *Id.*  The court also noted that Santiago was stopped at 9:00 a.m; the highway on which he traveled was not deemed a major drug corridor; and Santiago's computer check did not elicit that he had a prior arrest or criminal record.

There also was no evidence that, before asking for consent to search, the trooper had returned the driver's license and registration to defendant or told him that he was free to go. Under the circumstances, it was unreasonable for the trooper to continue to detain the defendant after the records check was completed. *Id.* The Fifth Circuit concluded that the defendant's consent to search was not an independent act of free will, but rather a product of an unlawfully extended detention. *Id.* at 343.

In *United States v. Jones,* 234 F.3d 234 (5th Cir. 2000), two officers pulled over a motorist and his passenger for a speeding violation. *Id.* at 237. The officer detained the defendant three minutes beyond the completion of the computer check, obtained the defendant's consent to search his vehicle, and subsequently found illegal narcotics. *Id.* at 241-42. The officer's basis for reasonable suspicion of drug activity pointed to the following facts: the defendant's inconsistent statements regarding his place of employment, the defendant's contradictory responses about his passenger's employment, and the fact that the defendant's passenger had been previously arrested for a cocaine charge. *Id.*

The Fifth Circuit concluded that, based on the totality of the facts, that officer's three minute detention of Jones after the completion of the computer check was unreasonable. Jones was stopped

in the morning (11:57 a.m.), and Jones and his passenger had clean records. *Id.* at 241. Compared

to the facts in *Dortch,* the Fifth Circuit explained that the trooper's bases for reasonable suspicion

were even less suggestive of reasonable suspicion and were "at best trivial." *Id.* Specifically, the

allegedly inconsistent statements about the passenger's job did not amount to reasonable suspicion

about drug trafficking. *Id.* The Fifth Circuit further found the defendant's consent to search was not

valid because the causal chain between the illegal detention and the consent was not broken. *Id.* at

342. Therefore, the search was nonconsensual. *Id.*

## 2. *Brigham*

The Court now turns to the Fifth Circuit's *en banc* decision in *United States v. Brigham*, 382

F.3d 500 (5th Cir. 2004). In *Brigham,* the driver and three friends were pulled over at approximately

4:13 p.m. on a highway in East Texas for following too closely behind another vehicle in violation

of Texas traffic laws. *Id.* at 504. The officer approached the driver and asked him to step out of the

car and provide his license and insurance papers. *Id.* The driver complied and produced a car rental

agreement listing a fifty year old female as the lessee. No additional drivers were authorized on the

rental agreement. *Id.* It did not appear that the fifty year old female was among the passengers in the

car so the officer became suspicious. *Id.*

The officer began asking the driver a series of basic questions about his group's travel plans.

The driver stated they were coming from Houston. The driver stated they had stayed at a La Quinta

Inn, but he had difficulty explaining where the motel was located. *Id.* The driver avoided making

eye contact with the officer and appeared to be extremely nervous. He also responded to the officer's

questions with questions of his own. *Id.* Based on the officer's experience, he believed the driver

was fabricating answers to the questions, and the officer decided to verify the driver's story with

12

other occupants of the car.  *Id.*

At 4:17 p.m., four minutes after the stop began, the officer asked a passenger to step out of the vehicle. The passenger produced an I.D. card that the officer would later discover was fictitious. *Id.*  The passenger's description of the group's travel plans was somewhat inconsistent with that offered by the driver. The passenger also avoided eye contact and appeared extremely nervous.  *Id.*

At 4:20 p.m., the officer questioned the other two occupants. Both appeared confused and also were inconsistent concerning the group's travel plans. *Id.* at 504-505.  At 4:21 p.m., the officer returned to his car to run computer checks on the car and the identification cards he had received. *Id.* at 505.  He told the driver that if his license was clean, "they would soon be back on their way." *Id.* Even though the car checked out, the officer remained suspicious given the behavior of the driver and occupants, their inconsistent descriptions of their travel plans and because, in his experience, the fact that a car is not yet reported stolen does not necessarily indicate that it was not actually stolen. *Id.* As he awaited the results of the I.D. checks, the officers continued to make verbal notes about the car's occupants, stressing that the driver and one of the passengers avoided eye contact with him and that all the stories about the purpose of the visit in Houston were in conflict.  *Id.*

At 4:29 p.m., the results of the I.D. checks suggested that one of the occupant's I.D. card was likely fictitious. *Id.*  The officer confronted that occupant and eventually learned his real name. The officer then returned to his car to check the occupant's actual identity. *Id.*  While that check was pending, the officer "waved over a Nacogdoches police unit to provide backup. . . ." *Id.*

The officer then provided the driver with a written warning for following too closely and returned his driver's license to him. He explained to the driver that one of his responsibilities was

to intercept illegal contraband such as guns, stolen property and narcotics. The driver denied that any illegal items were in the car and acceded to a request for a search. *Id.* The officer removed all of the passengers from the car and patted them down. *Id.* At 4:42 p.m., approximately thirty minutes after the stop began, the officer discovered a cooler containing liquid codeine located in the trunk of the car. *Id.*

The driver did not challenge the validity of the initial traffic stop. *Id.* at 506. Instead, he argued that the officer "exceeded the scope of the valid stop and prolonged the occupants' detention excessively and unconstitutionally when, after determining that neither [the driver] nor the other occupants of the rental car were its authorized drivers, [the officer] interrogated them about their travel plans and then instituted computerized vehicle and I.D. checks." *Id.*

The initial panel decision held that the officer unconstitutionally extended the traffic stop by questioning the driver *before* he began a computer check on the I.D.s and the rental car's registration. The panel also held that the driver's consent to search the vehicle was involuntary because it was tainted by the Fourth Amendment violation. The underlying conviction was reversed.

The *en banc* Fifth Circuit found no Fourth Amendment violation and affirmed the conviction. According to the Court, the panel's decision erroneously required the officer to return to the patrol car immediately after the officer learned that none of the occupants seemed to be an authorized driver and undertake a registration check to determine whether the car had been reported stolen. According to the *en banc* court, such an approach "misunderstands the Supreme Court's insistence on reasonableness rather than prescriptions for police conduct under the Fourth Amendment and extends this circuit's precedents too far." *Id.* at 507. Instead, the "correct analysis requires district

14

courts to consider the facts and circumstances of each case, giving due regard to the experience and training of the law enforcement officers, to determine whether the actions taken by the officers, including the length of the detention, were reasonable under the circumstances." *Id.* The detention must be temporary and "last no longer than necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *Id., citing Dortch,* 199 F.3d 200.

The court reemphasized there is no constitutional impediment to an officer's request to examine a driver's license and vehicle registration or rental papers during a traffic stop and run a computer check on them. *Id.* at 508. "An officer may also ask about the purpose and itinerary of a driver's trip during the traffic stop. . . . Such questions may efficiently determine whether a traffic violation has taken place, and if so, whether a citation or warning should be issued or an arrest made." *Id.* All of these inquiries are within the scope of investigation attendant to the traffic stop. *Id.*

The court rejected any notion that a police officer's questioning, even on a subject unrelated to the purpose of a routine traffic stop, is itself a Fourth Amendment violation. *Id.* "Detention, not questioning, is the evil at which *Terry's* second prong is aimed." *Id.* "Mere police questioning, without some nonconsensual restraint on one's liberty, is not a 'seizure' or detention." *Id.* A consensual interrogation may follow the end of a valid traffic stop, and such a consensual encounter does not implicate Fourth Amendment concerns. *Id.*

In *Brigham*, the *en banc* court found the officer's questioning of the driver and the occupants was within the scope of the detention justified by the traffic stop, particularly after the officer ascertained that the driver was not the owner or lessee of the vehicle; the lessee was not present in

the car; and the versions of the itinerary conflicted. The process, from the time the officer started questioning the driver until he returned to his patrol car to check the registration, lasted only seven minutes.  *Id.* at 509.

"Equally within the legitimate scope of the stop were the registration and license checks that [the officer] then initiated on the vehicle and its occupants. . . .  This procedure would have been permissible even without the additional information he had gleaned, which led to a reasonable suspicion that, at the very least, the vehicle might have been stolen."  *Id.* While the dispatcher informed the officer that the car had not been reported stolen, the officer "reasonably waited for the I.D. checks to be completed because, in his experience, the fact a vehicle has not yet been reported stolen does not mean the vehicle has not actually been stolen.  *Id.*

Once the officer learned that one occupant's I.D. card was likely false, he acted reasonably through further questioning to uncover the occupant's true identity and perform a correct background check. *Id.*  Because the officer was still waiting for the computer check at the time that he received consent to search the car, the detention to that point continued to be supported by the facts that justified its initiation. *Id., citing United States v. Shabazz,* 993 F.2d 431, 437 (5th Cir. 1993).

The Fifth Circuit distinguished *Dortch*, *Jones*, and *Santiago*, stating those "cases are about timing and sequence: after the computer checks came up 'clean,' there remained no reasonable suspicion of wrongdoing by the vehicle occupants" and continued questioning thereafter unconstitutionally prolonged the defendants.  *Brigham*, 382 F.3d at 510.  In *Dortch* and *Jones*, the extended detentions were reinforced by the officers' retention of the suspects' drivers' licenses.  *Id.* The Fifth Circuit emphasized in *Brigham* that the overall detention must be justified by reasonable

suspicion, and there is "no constitutional stopwatch on traffic stops." *Id.* at 510-511. The relevant question in assessing whether a detention extends beyond a reasonable duration is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *Id.* at 511.  "Computerized license and registration checks are an efficient means to investigate the status of a driver and his auto, but they need not be pursued to the exclusion of, or in particular sequence with, other efficient means." *Id.* There is no single formulaic approach that an officer must adopt in order to allay his reasonable suspicions during a traffic stop. *Id.* at 512.

According to the Fifth Circuit:

> [W]e do not presume to prescribe in the abstract the scope of questioning, investigative techniques, or the length of permissible detention that may be undertaken following a valid traffic stop. The bounds of existing caselaw are clear, if fact-intensive: a traffic detention may last as long as is reasonably necessary to effectuate the purpose of the stop, including the resolution of reasonable suspicion, supported by articulable facts within the officer's professional judgment, that emerges during the stop.

*Id.* Because there was no Fourth Amendment violation, the driver's consent to search the vehicle was not unconstitutionally tainted. His consent was voluntarily given, and the evidence obtained from the car was properly obtained as the result of a consensual search. *Id.*

### 3.      Post-*Brigham*

In *United States v. Jenson,* 462 F.3d 399 (5th Cir.2006), the defendant was stopped for speeding. However, the defendant took between thirty seconds and a minute to bring his vehicle to a stop in response to the police officer's emergency lights. *Id.* at 402.  The officer believed that the delay in bringing the vehicle to a stop might have been caused by the passengers in the vehicle trying to conceal something or corroborate stories.  *Id.*

When the driver exited his vehicle, the officer informed him of the reasons for the stop and

17

asked him questions about his employment and the purpose of his trip. *Id.*   The driver and the passengers provided the officer with their drivers' licenses, and the officer ran checks on the licenses. The officer received word from dispatch that the licenses were clear. *Id.*

It is uncertain when the officer gave the driver the written warning "though it probably occurred before [the officer] asked [the driver's] permission to search the vehicle." *Id.*   The officer testified it was his usual practice to return the driver's license at the same time he issues the warning. *Id.*

The defendant, who was initially calm and cooperative, became excessively talkative, answering questions that were not asked, which caused the officer to think the driver was nervous. The driver continued to exhibit this behavior even after he was issued the warning, which the officer found "odd because in his experience, a driver normally becomes less agitated when he realizes he is not receiving a citation." *Id.* at 402-403.   The officer continued to question the defendant and a passenger about their employment, which resulted in a discrepancy between the two answers. The officer believed the discrepancy was suspicious. *Id.* at 403.   The officer then asked for permission to search the vehicle, which was granted. *Id.*   There was no indication that the officer told the defendant he was free to leave before requesting permission to search.  *Id.*

The officer then told the defendant that he needed to conduct a pat-down search, and the defendant suddenly became upset and complained of harassment. The defendant started emptying his pockets, at which point the officer unholstered his weapon and told him to put his hands behind his back. *Id.*   The pat down search revealed a small "two-shooter" gun on the defendant's person. *Id.* The officer then put the defendant in the patrol car and ran a background check on him. The

18

check revealed that the defendant was a convicted felon. *Id.* A subsequent search at the jail revealed a bag of marijuana in the defendant's sock. *Id.*

The defendant conceded that the initial stop was justified, but he argued that the request to search the vehicle and the pat-down search of his person were not reasonably related to the circumstances justifying the stop. *Id.* The district court denied the motion to suppress, but the Fifth Circuit reversed and suppressed the evidence. The court found there was no reasonable suspicion to prolong the traffic stop. Specifically, the court found that thirty seconds to a minute was a reasonable amount of time for the defendant to respond to the flashing of the emergency lights. *Id.* at 405. The officer also failed to articulate any particular connection between the allegedly suspicious behavior and drug or weapon possession. *Id.*

It also did not affect the analysis that only four minutes elapsed between the I.D. clearance and the defendant's consent to the search. *Id.* at 406 n. 7. According to the court, "there was insufficient reason for suspicion to continue once Jenson's ID cleared; a constitutional violation occurred the *moment* the detention continued past that point." *Id.* [Italics in original].

The court then turned to the issue of voluntariness of the defendant's consent. Even assuming the defendant's consent was voluntary (as the district court had found), the Fifth Circuit concluded that the government failed to prove that the defendant's consent was an independent act of free will and not the product of the illegal detention. *Id.* at 407. The consent followed closely on the heels of the illegal detention, and there was no evidence that the defendant knew he was free to leave or that his license had been returned to him, both of which might be viewed as intervening circumstances. *Id.* In summary, the Court held that "the request to search occurred after the

defendant's license cleared, and as instructed by *Dortch, Jones* and *Santiago*, there was no reasonable suspicion to justify prolonging the [detention], nor was the consent given independently of the illegal detention." *Id.* at 408.

## V.  DISCUSSION

**A.      First prong of *Terry* analysis – whether Hogue's action was justified at its inception**

The evidence shows the first prong of the *Terry* analysis is easily met. Hogue had probable cause to stop Defendant for a traffic violation.  Although Defendant argued in his motion to suppress Hogue had no reasonable suspicion to believe a traffic violation had occurred, Defendant conceded at the hearing that Hogue initially stopped Defendant's car for failure to maintain a single lane of traffic. This conduct is in violation of Section 545.060(a)(1) and (2) of the Texas Transportation Code.  Texas law provides that a peace officer may lawfully stop and detain a person for a traffic violation.  *McVickers v. State*, 874 S.W.2d 662, 664 (Tex.Crim.App. 1993).  The Court concludes, as conceded by Defendant at the hearing, the stop of Defendant's vehicle was valid, and the purpose for the initial detention was justified at its inception.

**B.      Second prong of *Terry* analysis – whether Hogue's subsequent actions were reasonable**

The Court turns to the second prong of *Terry*, whether Hogue's subsequent actions were reasonably related in scope to the circumstances that justified the stop. An officer may temporarily detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may have occurred.  *U.S. v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).  The suspicion required to justify such a detention need not rise to the level of probable cause but must be based on more than an unparticularized suspicion or hunch. *Id.*

20

In determining whether reasonable suspicion existed to justify a defendant's continued detention, the court must look at the totality of the circumstances and consider the collective knowledge and experience of the officers involved.  *U.S. v. Holloway*, 962 F.2d 451, 459 & n. 22 (5th Cir.1992).

"Detention, however, may last no longer than required to effect the purpose of the stop." *United States v. Jenson*, 462 F.3d 399, 404 (5th Cir. 2006). "In the course of effectuating the stop, a police officer may permissibly examine the driver's license and registration and run a computer check on them to investigate whether the driver has any outstanding warrants and if the vehicle is stolen." *Lopez-Moreno*, 420 F.3d at 430.  "An officer may also ask the driver about the purpose and itinerary of his trip." *Id.* at 430-31.  The officer's questions "need not even be related to the purpose of the traffic stop, since '[d]etention, not questioning, is the evil at which *Terry's* second prong is aimed.'" *Id.* at 431, *quoting United States v. Brigham*, 382 F.3d 500, 508 (5th Cir. 2004)(en banc).

"If all computer checks come back clean, then as a general matter reasonable suspicion disappears, and there is no legitimate reason for extending the stop." *Jenson*, 462 F.3d at 404. "A recognized exception to this rule is that if additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed." *Id.*, *quoting Lopez-Moreno*, 420 F.3d at 431.  Under *Brigham*, the officer's subsequent actions may also be related to "dispelling [the officer's] reasonable suspicion developed during the stop." *Brigham,* 382 F.3d at 507.

Clearly, Hogue's actions before issuing the warning were reasonably related in scope to the circumstances that justified the stop in the first place. Hogue could properly run computer checks on the vehicle and Defendant. Even questions unrelated to the purpose of the stop are permissible.

21

It was reasonable for Hogue to inquire as to Defendant's travel, to ask for the vehicle registration, and to question the notepad in the glove box that was immediately covered by Defendant.  An officer may ask questions outside the scope of the stop, but only so long as such questions do not extend the duration of the stop. *U.S. v. Machuca-Barrera*, 261 F.3d 425, 432 (5th Cir.2001).

Defendant argues the evidence against him must be suppressed because Hogue unconstitutionally prolonged the stop by continuing to ask Defendant questions regarding his travel plans after Hogue gave Defendant the written warning, his driver's license, and his insurance.   The issue before the Court is whether Hogue had reasonable suspicion to continue questioning Defendant based on articulable facts that Defendant was involved in drug trafficking.

Hogue testified that when Defendant opened his glove box to retrieve his proof of insurance, Hogue observed a notepad with handwritten information on the top page. The information appeared to include a name, various numbers, and the names of various cities. Defendant immediately retrieved a piece of paper from the floorboard and put it on top of the notepad.  Hogue asked Defendant about the information on the notepad. Defendant began stuttering and at first claimed that he did not know what the information was about.  Defendant then stated that the name on the pad was the name of his wife's aunt and that the number was her phone number. Defendant went on to state that the other numbers on the notepad related to purchasing gas from various locations during his trip.

Hogue advised Defendant that he would be issued a written warning for the traffic violation. Hogue urged Defendant to drive more carefully. Hogue asked Defendant if he had been driving for a long time; Defendant replied "yes" and went on to explain that he planned to stop in Dallas, but

that his destination was Harker Heights, which is near Killeen, Texas.  Defendant went on further to explain that he was traveling to visit his aunt. Hogue asked if the name on the notepad was the name of his aunt, but Defendant said "no" and repeated that the name on the notepad was his wife's aunt.

At approximately 6:12 p.m. Hogue returned to his patrol car to write out the warning. The video of the stop showed Hogue stating out loud on his walk back to the patrol car that he was suspicious.  In addition, as he was writing the warning, Hogue discussed his suspicion regarding the notepad with one of his fellow troopers who had arrived as back up. At the hearing, Hogue testified that in his experience, when he has found contraband and currency during traffic stops, he has oftentimes also found names, cities, and numbers relating to gas in gas tanks (Tr. 18-19). Hogue testified a gas gauge is affected if the inside of the gas tank is altered.  Therefore, oftentimes, drug traffickers will write down how many miles they drive before they have to refuel the car (Tr. 19).

Hogue returned to Defendant's car and handed Defendant the written warning and returned Defendant's driver's license and insurance through the open passenger's side window. Hogue testified Defendant's responses to his questions regarding the notepad gave rise to suspicions unrelated to the traffic offense because Defendant acted nervously and could not adequately explain the notepad. However, Hogue further testified that at the time he handed Defendant the written warning, license, and insurance, he did not "feel like [he] had enough to detain him." (Tr. 22).  Even though Hogue did not feel like he could continue to detain Defendant, Hogue made clear on the videotape that he remained suspicious about the notepad and Defendant's questions regarding the notepad.

Given Hogue's suspicions regarding the notepad, after returning Defendant's items, Hogue continued to lean with his elbows into the passenger's side window of Defendant's car, asking Defendant about his travel plans.  The questions were specifically related to Hogue's suspicions regarding the notepad and Defendant's earlier explanations regarding the name and/or number written on the notepad. Hogue testified Defendant's answers to these additional questions did not satisfy Hogue's suspicions, but rather increased them.  Specifically, Hogue asked Defendant if he was in Texas for a visit, and Defendant responded that he was going to visit his aunt. Hogue asked Defendant if his aunt was expecting him, and Defendant replied "no." This further raised Hogue's suspicions because Hogue felt it was unlikely that a person would travel from Illinois to Texas to visit a relative and not tell that relative that they were coming.

At approximately 6:14 p.m., Hogue asked Defendant if he had any luggage.  Defendant indicated that he had luggage in the trunk of the car and, without any request from Hogue, he asked Hogue if he would like to see it. Defendant opened the car's trunk, and Hogue observed a duffle bag that appeared to be packed with a few clothes. Defendant volunteered that he only had enough clothes for three days. Defendant went on to explain that his aunt had cancer and that he wanted to see her.

Hogue then asked Defendant if Defendant had anything illegal in the car.  Hogue asked for consent to search the car, and Defendant did not immediately answer.  Instead, he looked at his feet. Even though Hogue and Defendant had been conversing in English for several minutes up to this point in time, Hogue then asked Defendant in Spanish if he would allow Hogue to search the car. Defendant responded, "no problemo."

24

There is no evidence that Hogue delayed the stop for an improper purpose. Defendant's immediately covering the Super 8 notepad in the glove box caused Hogue to believe Defendant did not want him to see it.  Defendant nervously and hesitantly provided inconsistent answers about the information on the notepad. After Hogue questioned Defendant about the notepad and his travel plans, Hogue returned to his patrol vehicle and began the computer check on Defendant. That sequence is permitted by *Brigham.*

Hogue noted his suspicion regarding the notepad on the video, and he discussed his suspicion with another officer who had pulled alongside Hogue's patrol vehicle. After completing the warning ticket, Hogue exited his patrol car and returned Defendant's driver's license and warning ticket to him, stating "here you go."  At that point, Defendant was free to leave. It was only after Defendant had been released to leave the scene that Hogue again asked Defendant about his visit to see his aunt. After again receiving a suspicious answer, Hogue asked for and received consent to search Defendant's vehicle.

The fact that Defendant's license had been returned to him and he was free to leave distinguishes this case from the pre-*Brigham* cases. In *Dortch,* the defendant never felt free to leave because the officers maintained custody of the defendant's driver's license and told him they were detaining his vehicle until the canine unit arrived. In *Santiago,* the computer checks on the defendant and his license came back clean, but the detention continued while the officer waited for back-up, even though there was no reasonable suspicion to justify further detention. In *Jones,* the officer continued his detention of the defendant even after the computer checks came back negative and despite the absence of reasonable suspicion of criminal activity. Moreover, in *Jenson*, decided after *Brigham*, it was uncertain when the officer gave the driver the written warning and his driver's

license.  In this case, however, the detention of Defendant ended as soon as Hogue returned Defendant's items. The detention, to the pointed it ended, was lawful.

Even assuming Hogue extended the detention after returning Defendant's items to him, Hogue had "reasonable suspicion based on articulable facts that [Defendant] was involved in drug trafficking." *United States v. Sanchez*, 2007 WL 1191180 (5th Cir. 2007)(unpublished).  Hogue had reasonable suspicion that criminal activity was afoot, and that suspicion increased throughout the encounter until Defendant consented to the search.  Specifically, Hogue's suspicions were aroused by the existence of the notepad in the glove box which Defendant immediately covered with another piece of paper that had fallen out of the glove box onto the floorboard (Tr. 16); Defendant's acting nervous when questioned about the notepad and first responding that he did not know what it was (Tr. 17); Defendant's stuttering a lot and having to think of something to say; Defendant then explaining he had written cities and where he had gotten gas on the notepad; Defendant's also stating his wife's aunt's name and phone number may also be written on the notepad, but later stating the number was his aunt's.  From Hogue's experience, when he has found contraband and currency, he has oftentimes also found  names, cities, and numbers relating to gas in gas tanks (Tr. 18-19). "The Supreme Court has emphasized the importance of allowing officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."  *Brigham*, 382 F.3d at 507.

There is nothing in the record to show or suggest that Hogue improperly prolonged the stop in order to obtain consent to search. Rather, the evidence shows that Hogue acted responsibly in resolving the reasonable suspicion that continued to emerge during the stop.  Hogue's actions under the totality of the circumstances were reasonable, and Defendant's continued detention did not

26

violate the Fourth Amendment.

**C.      Whether Defendant's consent to search was validly given**

Even if the Court were to assume, *arguendo*, Hogue unreasonably extended the traffic stop, another issue before the Court would be whether Hogue's consent to search cured any Fourth Amendment problem.   *See Jenson*, 462 F.3d at 406.   "Consent to search may, but does not necessarily, dissipate the taint of a fourth amendment violation."   *Id., quoting United States v. Chavez-Villarreal*, 3 F.3d 124, 127 (5th Cir. 1993).   To determine whether consent was validly given, the court considers (1) whether the consent was voluntary, and (2) whether it was an independent act of free will."   *Jenson*, 462 F.3d at 406.

In *U.S. v. Chavez-Villarreal*, 3 F.3d 124, 127 (5th Cir. 1993), the Fifth Circuit noted that when consent is evaluated after a Fourth Amendment violation, "[t]he admissibility of the challenged evidence turns on a two-pronged inquiry: whether the consent was voluntarily given and whether it was an independent act of free will."   Voluntariness focuses on coercion, and the second prong considers the causal connection between the "consent" and a prior constitutional violation. *Chavez-Villarreal*, 3 F.3d at 127.

In evaluating the voluntariness of a consent, the Court must consider six factors:

(1) the voluntariness of the defendant's custodial status;

(2) the presence of coercive police procedures;

(3) the extent and level of the defendant's cooperation with the police;

(4) the defendant's awareness of his right to refuse consent;

(5) the defendant's education and intelligence; and

(6) the defendant's belief that no incriminating evidence will be found.

*Shabazz*, 993 F.2d at 438.

Although all six factors are relevant, no single factor is dispositive. *Id.* "The government has the burden of proving, by a preponderance of the evidence, that the consent was voluntary." *Id.*

Here, the evidence shows that Defendant freely and voluntarily consented to a search of the vehicle. Hogue did not employ any coercive police procedures.  The videotape reveals Hogue was polite and courteous throughout the encounter. Defendant was also very cooperative throughout the encounter.  In fact, Defendant offered to show Hogue his luggage when Hogue asked Defendant if he had any luggage.  Defendant seemed able to understand and communicate with Hogue.  Only out of an abundance of caution did Hogue repeat his request for consent in Spanish.  While there was no evidence that Defendant was aware of his right to refuse consent or the level of his education and intelligence, nevertheless, considering the totality of the circumstances, Defendant's consent to search the vehicle was given voluntarily and freely.

## VI.  CONCLUSION

In sum, the initial stop of Defendant was justified, and the questions asked of and checks run on Defendant were proper.  Hogue did not improperly prolong the stop. The subsequent search of Defendant's vehicle was the result of a consensual encounter in which Defendant freely and voluntarily consented to the search of his vehicle. That consent was not the product of an illegal detention. Based on the foregoing, it is hereby

**RECOMMENDED** that Defendant's Motion to Suppress Evidence (Docket Entry # 13) be

**DENIED.**

Within ten (10) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations contained in the report.  A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within ten days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court.  *Douglass v. United States Auto Ass'n.*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

**SIGNED this 9th day of July, 2007.**

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE